IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

SECURITIES AND EXCHANGE COMMISSION §
§
V. § MISC. ACTION NO. 4:05-MC-043-Y
§
DAVID CHESNOFF and CHAKA HENRY §

ORDER GRANTING IN PART MOTION FOR
ORDER REQUIRING OBEDIENCE TO SUBPOENA

Pending before the Court is a motion for order requiring obedience to subpoena [doc. # 1], filed by applicant The Securities and Exchange Commission ("the SEC") on December 14, 2005. After consideration of the motion, the responses, and the replies, the Court GRANTS the motion, in part.

I. BACKGROUND

The SEC is investigating professional poker celebrity Doyle Brunson's public offer to acquire WPT Enterprises, Inc. ("WPTE"). WPTE is a publicly-traded company that develops and markets television gambling programs, such as the World Poker Tour. In early July 2005, Brunson contacted his law firm, Goodman and Chesnoff ("the Goodman firm"), to obtain legal services relating to the preparation of an offer to buy WPTE. (Brunson App. at 4.) Although Brunson asserts that he discussed the purchase with David Chesnoff, a partner in the Goodman firm, Chesnoff claims that he had no involvement in the purchase of WPTE. (Brunson App. at 4; Chesnoff Aff. [sealed] at 2.) Apparently, Brunson talked solely with Chaka Henry, an associate with the Goodman firm.

On July 7, WPTE received a letter, dated July 5, with a term sheet describing the proposed

purchase of WPTE by "a new company of investors" headed by Brunson for $700,000,000.[1] The letter and term sheet were sent to WPTE by Henry. That same day, Brunson issued a press release stating that Brunson had offered to buy the World Poker Tour for $700,000,000 in cash. WPTE contacted Henry and asked for more information on the financial backing for the offer. Henry told WPTE that she would speak with Brunson before responding.

On Friday, July 8, the New York Post ran an article stating that Brunson and "a team of financial backers" were attempting to buy the World Poker Tour for $700,000,000, but that "details of the bid are sketchy." WPTE confirmed that it had received the offer but stated it was trying to verify the offer's credibility. The day the article ran, WPTE's stock price rose from $17.75 to close at $26.50. After trading closed that day, Chesnoff faxed a letter to WPTE withdrawing the Goodman firm from representing Brunson regarding the offer.[2]

Before trading opened on Monday, July 11, WPTE issued a press release recounting its efforts to substantiate the offer and confirming that the offer would expire by its own terms on July 12. When the trading day ended on July 11, WPTE's stock closed at $23.20. WPTE then announced that Brunson had stated that WPTE should not "expect any further contact regarding the offer." Brunson's offer expired on July 12, and WPTE's stock closed at $21.98 that day.

The SEC began investigating Brunson's offer and requested voluntary production of documents from Goodman and Chesnoff and from Chesnoff personally regarding the offer. They produced a privilege log and withheld several documents surrounding the offer. When formally

---

[1] The offer expired on July 12, but WPTE could request a one-week extension.

[2] Chesnoff, who had been on vacation since July 5, learned of the term sheet and Henry's involvement that same day after another client of his heard about the term sheet and contacted Chesnoff.

2

subpoenaed, Chesnoff and Henry claimed attorney-client and work-product privileges.

## II. PRIVILEGES

### A. ATTORNEY-CLIENT

The attorney-client privilege protects from discovery certain communications among the lawyer, the client, and their representatives for the purpose of obtaining legal advice, provided they were intended to be confidential. *See, e.g., In re Grand Jury Proceedings*, 517 F.2d 666, 670 (5th Cir. 1975). The privilege also protects communications made between a potential client and a lawyer. *In re Auclair*, 961 F.2d 65, 69 n.9 (5th Cir. 1992). If there is no reasonable expectation that the communication will remain confidential, the attorney-client privilege does not apply. *See United States v. Robinson*, 121 F.3d 971, 976 (5th Cir. 1997), *cert. denied*, 522 U.S. 1065 (1998). The party asserting this privilege has the burden of demonstrating its applicability by establishing not only that an attorney-client relationship existed, but also that the particular communications at issue are privileged and that the privilege was not waived. *See Hodges, Grant & Kaufman v. United States Gov't*, 768 F.2d 719, 720-21 (5th Cir. 1985); *United States v. Jones*, 696 F.2d 1069, 1072 (5th Cir. 1982). If Brunson, Chesnoff, or Henry, as the proponent of the privilege, meets this burden, the burden shifts to the SEC to prove an applicable exception. *See Perkins v. Gregg County*, 891 F. Supp. 361, 363 (E.D. Tex. 1995). Applicability of the privilege is a question of fact, to be determined in light of the privilege's purpose and judicial precedents. *Hodges*, 768 F.2d at 721.

### B. WORK-PRODUCT

The work-product doctrine protects from discovery documents and tangible things, made in

anticipation of possible future litigation, showing the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation. *See United States v. Nobles*, 422 U.S. 225, 238 (1975); FED. R. CIV. P. 26(b)(3). In other words, the document or tangible thing must have been prepared in anticipation of litigation or for trial. The doctrine serves to protect the interests of clients and their lawyers in preventing disclosures about the case. *See In re Grand Jury*, 419 F.3d 329, 339 (5th Cir. 2005).

## III. DISCUSSION

The SEC requests 49 documents[3] that consist of (1) emails between Barbara Lewis, Brunson's personal assistant,[4] and Henry regarding the July 5 press release [bates nos. 1-11]; (2) drafts of the termination letter sent to Brunson and Lewis [bates nos. 13, 33, 60-70], (3) drafts of Brunson's and Lewis's affidavits prepared by Robert E. Murdock, who was hired to represent Chesnoff, Henry, and the Goodman firm regarding the submission of the term sheet to WPTE [bates nos. 17-23, 35-38, 43-59, 61-68]; (4) notations of phone calls between Brunson, Henry, and Lewis on July 7 and 8 [bates nos. 73-76]; (5) a draft of the term sheet [bates nos. 28-31]; and (6) "an envelope with handwritten notations" [bates no. 12]. Chesnoff, Henry, and Brunson argue that these documents are protected by either the attorney-client or work-product privilege. The SEC argues

---

[3]Although the privilege log lists 51 separate documents, two of the documents—Bates numbers 5 and 6—are not sought by the SEC. (Appl.'s Mem. in Supp. at 12.)

[4]The SEC argues that Lewis is actually a public-relations representative employed by The Business Lab and cannot be considered Brunson's representative for privilege purposes. However, Lewis was acting on Brunson's behalf in issuing the press release and offer and was acting as his representative to counsel. The SEC's arguments and evidence are not persuasive on this point. Further, because the SEC raised this argument for the first time in its reply brief, it should not be considered. *See SEC v. Kornman*, 391 F. Supp. 2d 477, 485 n.2 (N.D. Tex. 2005).

that (1) because Brunson intended to publicize the offer when he communicated with the Goodman firm, the communications are not privileged and (2) client-identity and financial information could not have remained confidential and, thus, are not protected under the attorney-client privilege.

### A. DOCUMENTS RELATING TO ISSUANCE OF THE TERM SHEET

The SEC requests that Chesnoff and Henry produce drafts of the term sheet, e-mails between Lewis and Henry, and phone logs reflecting calls between Brunson, Henry, and Lewis. These occurred before the issuance of the press release and the term sheet. The Fifth Circuit has not expressly addressed the applicability of the attorney-client privilege to underlying communications relied on in the creation of public-offering statements. In general, however, the Fifth Circuit has held that when a client intends to disclose information to third parties, the communication of that information to his attorney does not make it privileged. *See, e.g., United States v. El Paso Co.*, 682 F.2d 530, 540-41 (5th Cir.1982); *United States v. Pipkins*, 528 F.2d 559, 563 (5th Cir. 1976). Further, the privilege does not apply to information that the client intends his attorney to impart to others. *See Pipkins*, 528 F.2d at 563.

There is a split of authority regarding whether communications relied on in the creation of public-offering statements are privileged. The SEC relies on a Fourth Circuit case that holds the attorney-client privilege does not protect information communicated to an attorney for the purpose of preparing a prospectus for prospective investors in the client's business. *In re Grand Jury Proceedings (John Doe)*, 727 F.2d 1352, 1356-58 (4th Cir. 1984). In that case, an attorney was hired to prepare a prospectus to be used to enlist investors in the client's limited partnership. But the prospectus was never issued. The Fourth Circuit held that because the client gave the attorney

5

information to assist in preparing the prospectus that was to be published to others and was not intended to be kept in confidence, the attorney-client privilege did not protect the information. *Id.* at 1358. Based on this case, the SEC argues that because Brunson intended to publicize his offer and issued a press release announcing the offer, the details of the offer cannot remain secret. But some courts have concluded that only the information actually communicated to a third party fall outside the privilege. In other words, preliminary drafts of documents and communications made between attorney and client during the drafting process are privileged. *See, e.g.,United States v. Upjohn*, 600 F.2d 1223, 1227 n.12 (6th Cir. 1979), *rev'd on other grounds*, 449 U.S. 383 (1981);*Natta v. Hogan*, 392 F.2d 686, 692 (10th Cir. 1968); *Apex Mun. Fund v. N-Group Sec.*, 841 F. Supp. 1423, 1427-28 (S.D. Tex. 1993); *Buford v. Holladay*, 133 F.R.D. 487, 492 (S.D. Miss. 1990); *United States v. Schlegel*, 313 F. Supp. 177, 179 (D. Neb. 1970).

As pointed out by the Fourth Circuit, courts have consistently refused to apply the privilege to information that the client intends his attorney to impart to others or that the client intends shall be published or made known to others. *In re Grand Jury Proceedings*, 727 F.2d at 1356. Indeed, any disclosure inconsistent with maintaining the confidential nature of the attorney-client relationship waives the privilege. *Id.* at 1357. Additionally, any voluntary disclosure by the client to a third party waives the privilege not only as to the specific communication disclosed, but often as to all other communications relating to the same subject matter. *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982).

Under the facts of this case, the attorney-client privilege does not apply to the documents relating to the preparation of the term sheet. Simultaneously with the mailing of the term sheet to WPTE, Brunson issued a press release giving sketchy details of this offer to buy WPTE. By putting

his offer in the public arena and by putting at issue the details of his offer, he could not reasonably believe that those same details could be kept confidential. Further, these documents were not made in anticipation of litigation and are, thus, not protected by the work-product doctrine. Accordingly, bates numbers 1-11, 28-31, and 73-76 are not privileged and should be produced.

### B. TERMINATION LETTERS

The SEC further seeks production of drafts of the termination letter that the Goodman firm sent to Brunson terminating its representation regarding the WPTE term sheet. The Court cannot determine whether the attorney-client or work-product privileges apply to these letters. However, after an in camera review of the letters, the Court concludes that they contain no information that is relevant to the SEC's investigation. Thus, Chesnoff and Henry are not required to produce bates numbers 13, 33, and 60-70 to the SEC.

### C. DRAFT AFFIDAVITS

The SEC seeks production of drafts of affidavits and notes regarding the affidavits that Murdock prepared in anticipation of litigation arising from the submission of the term sheet to WPTE. These documents were clearly made in anticipation of litigation and are protected by the work-product doctrine. The SEC's arguments that Murdock prepared the affidavits before he was formally retained are not persuasive. *Cf. In re Auclair*, 961 F.2d at 69 n.9 (holding communications made between a potential client and a lawyer are protected by the attorney-client privilege). Thus, bates numbers 17-23, 35-38, 43-59, 61-68 are privileged.

D. ENVELOPE WITH NOTATIONS

The final document requested by the SEC [bates no. 12] is described as an "envelope with handwritten notations" that illustrates "thought processes of the attorney" relating to "longstanding clients of the firm." (Chesnoff & Henry Resp. at 6; Brunson App. at 2.) No other information is given regarding who made the notations or when. Brunson, Chesnoff, and Henry have failed to establish that this communication is privileged and that the privilege was not waived; thus, they have failed to carry their burden, and this Court cannot sustain the asserted privileges. *See Hodges*, 768 F.2d at 720-21; *Jones*, 696 F.2d at 1072.

E. CRIME-FRAUD EXCEPTION TO DEFEAT PRIVILEGES

The SEC argues that even if the attorney-client or work-product privileges protect the documents and possible testimony, the crime-fraud exception defeats the privilege because Brunson used his attorneys to facilitate a violation of the antifraud provisions of the federal securities laws.[5] Indeed, when a client seeks legal advice in furtherance of a crime or fraud, the attorney-client communications are not privileged, and may be discovered. *See United States v. Zolin*, 491 U.S. 554, 562-63 (1989). The exception applies even if the criminal activity is solely on the part of the attorney or even when the attorney is unaware that the client is planning a crime or fraud. *See Clark v. United States*, 289 U.S. 1, 15 (1933). The controlling question is whether there is a reasonable basis to suspect that communications at issue were undertaken to facilitate or conceal the commission of a crime or fraud. *See, e.g., In re Richard Roe, Inc.*, 168 F.3d 69, 70 (2$^d$ Cir. 1999);

---

[5]The crime-fraud exception applies to documents protected by the attorney-client privilege and also to documents protected by the work-product doctrine. *See In re Grand Jury Subpoena*, 419 F.3d 329, 335 (5th Cir. 2005).

8

*United States v. Jacobs*, 117 F.3d 82, 87 (2$^{\text{d}}$ Cir. 1997).  The party seeking discovery has the burden of establishing that the crime-fraud exception applies, and must present a prima-facie case that the communications were made in furtherance of a crime or fraud.  *See In re BankAmerica Corp. Sec. Litig.*, 270 F.3d 639, 642 (8th Cir. 2001).  This burden is not satisfied by a showing that the material in question might provide evidence of a crime or fraud.  *See In re Richard Roe*, 168 F.3d at 71.

The Court concludes that the SEC has failed to surmount this high burden.  Although Brunson's actions show an ineptness, they do not rise to the level of a prima-facie case of commission of a crime or fraud.  Brunson convincingly rebuts the SEC's facts offered to support its prima-facie case.  (Brunson's Mem. of Law at 18-22.)

## IV. CONCLUSION

Thus, it is ORDERED that Chesnoff and Henry shall produce to the SEC the documents appearing on the privilege log as bates numbers 1-12, 28-31, and 73-76.  Further, Chesnoff and Henry shall submit to SEC testimony and answer, on the record and under oath, each of the SEC's questions relating to:

1. the preparation and delivery of Brunson's term sheet to WPTE, including communications with Brunson and his representatives about the term sheet, the identity of the new company of investors Brunson led, the source of financing for the term sheet, and responses to WPTE's requests for information about the offer; and

2. any trading in the securities of WPTE and its parent company Lakes Entertainment, Inc.

SIGNED July 18, 2006.

*[signature: Terry R. Means]*

TERRY R. MEANS
UNITED STATES DISTRICT JUDGE